IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| REGINA PRICE,<br>5116 Woodmere Drive<br>Centreville, VA 20120<br><br>**Plaintiff,**<br><br>v.<br><br>BOOZ ALLEN HAMILTON,<br>8283 Greensboro Dr.,<br>McLean, VA 22102<br><br>Serve: CT CORPORATION SYSTEM<br>4701 Cox Rd.,<br>Suite 285<br>Glen Allen, VA 23060<br><br>**Defendant.** | Civil Action No.: 1:18cv33 (CMH/TCB) |

**CIVIL COMPLAINT FOR EQUITABLE
AND MONETARY RELIEF AND DEMAND FOR JURY**

**INTRODUCTION**

Plaintiff Regina Price ("Plaintiff" or "Price") brings this civil complaint of unlawful retaliation in violation of the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, *et seq.*; the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101, *et seq.*; and unlawful retaliation in violation of ADA, 42 U.S.C. § 12203, *et seq.* against Defendant Booz Allen Hamilton ("Defendant" or "Booz").

**PARTIES**

1. Plaintiff is a citizen of the United States and is domiciled in Virginia. Plaintiff is a "person" and "employee" as defined by the FMLA, ADA, and ADEA.

2. Defendant Booz employed Plaintiff out of its McLean, Virginia office. Booz Allen Hamilton is an "employer" as defined by the FMLA and the ADA.

3. Booz is a Virginia corporation that has its principal place of business in McLean, Virginia.

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this is an action arising under the laws of the United States, specifically the FMLA and the ADA.

5. This Court has personal jurisdiction over Defendant Booz because it conducts regular business in and has substantial and deliberate contacts with the commonwealth of Virginia. Booz conducts regular business in the Eastern District of Virginia at 8283 Greensboro Dr., McLean, VA 22102.

6. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because all or a substantial portion of the unlawful employment practices occurred within this judicial district, which was the primary location of Plaintiff's employment with Defendant.

## FACTUAL ALLEGATIONS

7. Price began working for Booz in McLean, Virginia as a Senior Contracts Administrator on or around October 15, 2013.

8. While Price was still new to Booz, she volunteered to support the Subcontracts Group with their upcoming Contractor Purchasing System Review ("CPSR") audit.

9. While working on the Audit, Price worked twelve hour long days as well as nights and weekends to ensure her tasks were accomplished.

10. Due to Price's superior performance Booz awarded Price an award for her excellent performance within thirty days of her hire. She was subsequently assigned a contracts portfolio valued in excess of one billion dollars that she managed successfully.

11. After six months, Price decided to start looking for another job internally and reached out to other managers at Booz for advice.

12. Price was asked if she had an interest in an upcoming position within the Regulatory Compliance Department within its newly formed group called Assessment, Compliance, and Training ("ACT!") because of her experience in Contracts, Subcontracts, and networking abilities.

13. As noted on her Annual Performance Summary, her reputation preceded her on the ACT! team. The Annual Performance Summary notes that Price was brought to the ACT! team largely because of her interpersonal skills, responsive nature to team needs, and ability to work tasks to completion once she understood what was needed of her.

14. Price had an informal lunch meeting with Earned Value Management System ("EVMS")/Purchasing Procurement Focal Point ("PPFP") Senior Associate, Lisa Wolf ("Wolf"), on or around May 18, 2014 to discuss interviewing for the position in ACT!.

15. On or around June 12, 2014, Price officially interviewed with Ms. Wolf and ACT! Group Lead, Manuel Joaquin ("Joaquin"), who offered the position to Price with ACT! later that month.

16. Within ACT! Price performed well in this role until Wolf told Price during a team meeting that Price would be responsible for "remastering" Booz's Procurement Policy Manual ("PPM") in or around the first week of September 2014.

17. Wolf and Joaquin did not inform Price that remastering the PPM fell under her job description during her interview on or around June 12, 2014.

18. During neither of Price's formal or informal meetings with Wolf or Joaquin was Ms. Price informed that she would be handling the PPM. Instead, Price was under the impression that she would be assisting with reviewing subcontracts files for accuracy so the team could pass the CPSR.

19. Price was familiar with Wolf, as she had worked with her in the past. Wolf did not inform Price that remastering the PPM would be a task within her position in ACT! prior to the team meeting in or around September 2014.

20. Price's experience and skillset did not correspond with policy writing and nothing in Price's background would lead to a plausible presumption that Price was familiar with such tasks. Price informed Wolf that she was uncomfortable with being responsible for remastering the PPM.

21. Wolf reassured Price that Wolf would provide Price with the necessary resources and assistance to remaster the PPM.

22. On or around September 1, 2014, Price realized that she was struggling with remastering the PPM since she did not have the proper experience and decided to reach out to Wolf immediately to reiterate Price's concerns.

23. Elizabeth Schloer, Lead Regulatory Compliance associate, was assigned as Price's PPM co-lead in or around early September 2014 to assist in remastering the PPM due to inexperience on Price's team.

24. Price had multiple conversations with Elizabeth Schloer ("Schloer") where Schloer indicated that she thought it was strange that Price wasn't made aware about the PPM assignment because Wolf had already indicated that assignment to Schloer well beforehand.

25. But Schloer did not have experience in contracts or policy writing despite Booz's decision to assign her as a PPM co-lead.

26. Wolf and Price decided to go out for a welcome lunch on or around September 18, 2014 to discuss Price's concerns involving the PPM.  Price told Wolf that Price was very uncomfortable in completing this task; however, Wolf informed Price that Wolf was confident that Price could get the job done.

27. Wolf also told Price that she and Schloer would assist Price and assured Price that they would "have [Price's] back," referring to remastering the PPM.

28. On December 10, 2014, Price was informed that Price would be assigned to report to Schloer within ACT!.  Schloer then acted as Price's career manager.

29. After beginning the PPM rewrite, it became clear that many of the items contained far too much process and detail than necessary or prudent in a policy manual; ambiguous language allowing far too much room for interpretation; and several policies that did not actually exist and were instead in the form of emails and other informal direction. All this left Booz at risk during external audit processes.

30. Wolf and Dixie Peratt, Subcontracts Director, initially established a deadline of December 31, 2014, for the PPM.  But, ACT! missed the deadline due to inexperienced staff and continued interruptions by Contractor Purchasing System Review ("CPSR") audits, which began on or around December 15, 2014.

31. Price's transfer from Contracts to Regulatory Compliance was delayed one month and did not start until September 4, 2014, instead of August 2014. This only gave Price four months to get acquainted to her new position and to complete the PPM accurately and before December 31, 2014.

32. CPSR audits the PPM to ensure that Booz is in compliance with current regulations.

33. Wolf requested several extensions in order to get the PPM completed, but the extensions were denied by Peratt. Peratt felt the established deadline was adequate because prior staff (some of whom had been terminated) completed previous PPM remastering within two weeks during CPSR audits.

34. However, these previous staff members did a poor job at completing the PPM remastering because many of the regulations used were from 10 to15 years prior and were not in compliance with recent, more updated regulations.

35. Price was ill with the flu on or around December 26, 2014. When Price returned to work after the holidays, she was having difficulty focusing and concentrating. Price visited her medical doctor, who was unable to determine the cause of her symptoms.

36. On or around February 26, 2015, Price fell and hit her head on a desk at work, which resulted in a concussion.

37. The combination of her concussion and issues with focusing and concentrating continued through on or around April 13, 2015. The concussion impacted Price's performance, but she continued to work despite the workplace injury.

38. Price suffered a concussion in February 2015, and shortly thereafter developed concentration issues. These symptoms made it difficult for her to perform, especially given her

lack of policy writing training or experience. Those symptoms persisted for two to three months. She was forced to seek medical treatment with her primary care physician and other therapists which provided only temporary relief.

39. The entire ACT! team, Wolf, Schloer, Joaquin, Joshua Wynne, and Nicole Gleich were all well aware of the concussion and concentration issues that Price suffered.

40. The team was close-knit and met regularly on a weekly or bi-weekly basis to discuss work-flow and often, personal matters were discussed, including Price's injury. Wolf submitted an injury report for the concussion on Price's behalf which automatically generated a Human Resource request for Workers Compensation Benefits.

41. Price set up a flex-schedule with Booz through Schloer to compensate for Price's injuries and allow Price to work if she was feeling well.

42. Ms. Schloer and Price did not set up a flex-schedule through Human Resources, but Ms. Schloer merely approved any requests or notifications of illness informally through email.

43. Despite Price's injuries, she received an acceptable Annual Performance Review along with a salary increase on or around January 16, 2015.

44. Although her acceptable Annual Performance Review included suggestions that Price should write new policies and revise previous policies to better her performance, Wolf told Price that Price should not worry and that these comments were simply guidance.

45. On or around April 7, 2015, Ms. Wolf asked for a copy of Price's resume. Wolf later told Price that Wolf now realized then that Price did not have the necessary policy writing experience, despite Price having told Wolf this months before.

46. On or around April 16, 2015, Wolf issued Price a Performance Improvement Plan ("PIP") that detailed a number of strict and tight deadlines and tasks for remastering the PPM.

47. Wolf informed Price on or around April 16, 2015, during the PIP meeting that if Price had been on short term disability during the time period of around December 26, 2014 through April 13, 2015, that "we could have saved you."

48. Price did not receive any negative feedback verbally or in writing about her performance regarding the PPM remastering until she received the PIP on or around April 16, 2015.

49. Price asked Schloer on multiple occasions if Price could discuss her performance with Schloer, but Schloer continually made excuses or attempted to schedule a time to discuss at a later time.

50. Price was removed from all ACT! email exchanges and accounts on or around April 22, 2015.  Schloer informed Price that Schloer did not want Price's inbox to be too overloaded.

51. Schloer informed Price that the PIP would be reactivated for 90 days upon Price's return to work on or around April 22, 2015.

52. Price was on disability leave from around April 23, 2015 through October 22, 2015, due to stress, anxiety, and depression, which manifested itself in stress, nervousness, an inability to concentrate, insomnia, weight loss, and high blood pressure.

53. Price was concerned that Price would be unable to complete her tasks and the deadlines discussed in the PIP effectively after almost six months of leave without having any insight into the latest activities.

54. On or around October 7, 2015, Price retained legal counsel in fear of further discrimination and retaliation from Booz.

55. Price was concerned that Booz would discriminate and retaliate against her by terminating her for taking short term disability leave.

56. On or around October 20, 2015, Price's counsel contacted Booz and informed Human Resources Representative Russ Minyard that Price was being represented by counsel.

57. On or around October 20, 2015, Minyard informed Price's legal counsel that counsel should contact Booz's legal counsel to discuss Price's return to work.

58. On or around October 20, 2015, Kate Chirkova-Phu from Booz's Human Resources department asked for medical documentation regarding Price's ability to return to work.

59. Price provided the documentation when Price returned to work on or around October 21, 2015.

60. Upon her return to work on or around October 22, 2015, Price attempted to catch up on six months' worth of emails that she had missed within ACT!.

61. Price received an updated and revised PIP on or around October 27, 2015 with similar condensed tasks and deadlines.

62. Price immediately began working on the deadlines and tasks specified in the revised PIP, which included a deadline as soon as October 29, 2015.

63. Price returned the revised PIP to Schloer and Wolf by email with Price's signature on or around November 16, 2015.

64. Since Price had just returned from leave, Price was concerned with her ability to complete the same tasks and strict deadlines that caused her stress and depression on top of her previous concussion and injuries. Price sought to discuss her concerns with Schloer.

65. On or around October 27, 2015, Minyard informed Price that it was acceptable and welcomed by management to discuss the deadlines stated in the revised PIP if she was uncomfortable with them.

66. Schloer, however, informed Price on or around November 4, 10, and 13, 2015 that Price's level of performance had not improved up to Booz's expectations. Schloer reminded Price that Booz has the right to terminate her employment within 90 days if there is no timely and significant improvement.

67. During these meetings with Schloer throughout November 2015, Schloer was unwilling to discuss Price's concerns with the strict and constricted deadlines included in the revised PIP, or to engage in any interactive process with Price.

68. In particular, Price was distressed because her health continued to deteriorate after returning to work on or around October 22, 2015.

69. On or around November 13, 2015, Price had an outpatient procedure to remove a condition in order to prevent cancer and experienced complications throughout the end of November and beginning of December 2015. With the added stress, Price continued to be treated for depression and anxiety.

70. On November 18, 2015, although Price had met all of the designated PIP deadlines at that time, Schloer was still unhappy with the quality of Price's policy writing research and drafts of revised policies. Schloer informed Price that Price needed to think more critically and synthesize more when remastering the PPM.

71. On or around November 19, 2015, Price's physician informed her that she needed to stay home and rest for at least three days due to the complications from her prior outpatient procedure.

72. On or around December 4, 2015, Booz terminated Price's employment.

## COUNT I
## Family Medical Leave Act
## 29 U.S.C. § 2615, *et seq.*
## Retaliation

73. Plaintiff Price incorporates the allegations set forth in the foregoing paragraphs as though fully alleged herein.

74. Defendant Booz is an employer as defined by 29 U.S.C. § 2611(4)(A).

75. Plaintiff Price is an employee as defined by 29 U.S.C. § 2611(2)(A).

76. Price had a right under the FMLA to take twelve (12) work weeks of leave during any twelve (12) month period for family and health-related matters. 29 U.S.C. § 2612(a)(1).

77. During the course of her employment, Price exercised her right under the FMLA to take leave.

78. Price engaged in protected conduct when she requested and took FMLA leave, and when she complained of retaliation for exercising her rights under the FMLA, and when she hired counsel to protect her rights.

79. Booz violated the FMLA when immediately following Price's return from FMLA leave Booz subjected Price to higher scrutiny; subjected Price to greater demands; and ultimately terminated Price's employment because Price utilized FMLA leave.

80. Booz retaliated against Price in response to Price exercising her rights under the FMLA.

81. Booz's stated and reasons for terminating Price are pretext for unlawful discrimination.

82. Accordingly, Price demands such legal or equitable relief as will effectuate the purposes of the FMLA, including, but not limited to economic damages, liquidated damages, reasonable attorney's fees, pre-judgment interest, court costs, and any other relief that this Court deems just and equitable.

## COUNT II
### Americans with Disabilities Act of 1990
### 42 U.S.C. § 12101, *et seq.*
### Discrimination

83. Plaintiff Price incorporates all of the allegations set forth in the foregoing paragraphs as though fully alleged herein.

84. Defendant Booz is an employer as defined by 42 U.S.C. § 12111(5).

85. Plaintiff Price is an employee as defined by 42 U.S.C. § 12111(4).

86. On or about April 23, 2015, Plaintiff informed Defendant that she suffered from a disability as defined under the ADA.

87. Price was qualified to perform the essential functions of her job under 42 U.S.C. § 12111 and 29 C.F.R. § 1630.2(m).

88. Price could perform the essential functions of her job with accommodation.

89. Booz discriminated against Price based on her disability when after learning of her disability Booz subjected Price to higher scrutiny; subjected Price to greater demands; refused to engage in the interactive process; and ultimately terminated Price's employment because Price she had disability as defined under the ADA.

90. Booz failed to engage in the interactive process to identify what type of accommodations, if any, Price might need upon her return from leave for her disability and instead reinstated a PIP plan upon her return.

91. Booz's stated reasons for terminating Price are pretext for unlawful discrimination.

92. Price demands such legal or equitable relief as will effectuate the purposes of the ADA, including, but not limited to economic damages, compensatory damages, punitive damages, reasonable attorney's fees, pre-judgment interest, court costs, and any other relief that this Court deems just and equitable.

## COUNT III
### Americans with Disabilities Act of 1990
### 42 U.S.C. § 12203, *et seq.*
### Retaliation

93. Plaintiff Price incorporates all of the allegations set forth in the foregoing paragraphs as though fully alleged herein.

94. Defendant Booz is an employer as defined by 42 U.S.C. § 12111(5).

95. Plaintiff Price is an employee as defined by 42 U.S.C. § 12111(4).

96. On or about October 20, 2015, Price's counsel informed Booz that Price was being represented by counsel. Less than two months later, Booz terminated Price.

97. Price was qualified to perform the essential functions of her job under 42 U.S.C. § 12111 and 29 C.F.R. § 1630.2(m).

98. Price could perform the essential functions of her job with accommodation.

99. Price engaged in protected conduct when she retained legal counsel out of fear of discrimination on the basis of her disability.

100. Booz retaliated against Price when after learning of her hiring legal representation Booz subjected Price to higher scrutiny; subjected Price to greater work demands; refused to engage in the interactive process; and ultimately terminated Price's employment because Price invoked the protections of the ADA.

101. Booz retaliated against Price in response to her exercising her rights under the ADA and engaging in lawful oppositional activity.

102. Booz's stated reasons for terminating Price are pretext for unlawful retaliation.

103. Price demands such legal or equitable relief as will effectuate the purposes of the ADA, including, but not limited to economic damages, compensatory damages, punitive damages, reasonable attorney's fees, pre-judgment interest, court costs, and any other relief that this Court deems just and equitable.

## **PRAYER FOR RELIEF**

Based on the foregoing, Plaintiff Price respectfully requests that the Court enter judgment in her favor and award to her the following relief:

a. Reinstatement;

b. Economic damages;

c. Compensatory, liquidated and/or punitive damages and/or appropriate;

d. Attorney's fees and costs; and

e. Any other relief that this Court deems just and equitable.

## **DEMAND FOR JURY TRIAL**

Plaintiff Regina Price demands a trial by jury for any and all issues proper to be so tried.

Respectfully submitted,

/s/ Adam Augustine Carter

        R. Scott Oswald, *Bar No. 41770*
        Adam Augustine Carter, *Bar No. 32722*
        The Employment Law Group, P.C.
        888 17th Street, NW, 9th Floor
        Washington, D.C. 20006
        (202) 261-2803
        (202) 261-2835 (facsimile)
        soswald@employmentlawgroup.com
        acarter@employmentlawgroup.com
        *Counsel for Plaintiff Regina Price*